AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   3-23-mj-71717 MAG |
| Min "James" Paik | ) | |
| and | ) | |
| Hye Paik | ) | |
| | ) | |
| *Defendant(s)* | | |

FILED

Nov 14 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 2023 to November 2023 _____ in the county of _____ San Francisco _____ in the
_____ Northern _____ District of _____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit bribery |
| 18 U.S.C. § 666(a)(2) | Bribery of an agent of an organization receiving federal funds |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Allison Lopez.

☐ Continued on the attached sheet.

Approved as to form _____ /s/ _____
AUSA Casey Boome
AUSA David J. Ward

_____ /s/ Allison Lopez _____
*Complainant's signature*

Allison Lopez, FBI Special Agent
*Printed name and title*

Sworn to before me by telephone.

Date: _____ 11/14/2023 _____

_____ *Sallie Kim* _____
*Judge's signature*

City and state: _____ San Francisco, CA _____

Hon. Sallie Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND APPLICATIONS FOR SEARCH WARRANTS

I, Allison Lopez, a Special Agent with the Federal Bureau of Investigation, being duly sworn, state:

## INTRODUCTION

1.      I respectfully submit this affidavit in support of a criminal complaint charging MIN "JAMES" PAIK ("JAMES") and HYE PAIK ("HYE") (or collectively, "the PAIKS") with one count of conspiracy to commit bribery in violation of 18 U.S.C. § 371 and one count of bribery of an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(2) (the Subject Offenses).

2.      This affidavit is also submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the cellular telephone associated with Verizon Wireless phone number (408) 515-5258 (the SUBJECT DEVICE), which is described more fully in Attachment A-1.  The SUBJECT DEVICE is registered to HYE, who is known to be JAMES' spouse, and JAMES is the suspected user of the SUBJECT DEVICE.  Subscriber information indicates that the SUBJECT DEVICE is registered to HYE at the PAIKS' residence, 2886 Geary Blvd, San Francisco, California where agents have observed the PAIKS' during surveillance.  JAMES conducts business from SUBJECT DEVICE, and the FBI has obtained and reviewed text messages between JAMES, utilizing the SUBJECT DEVICE, and a Confidential Human Source (CHS-1) discussing the payment of bribes in exchange for leases on property owned by the Port of San Francisco.  There is probable cause to believe that the electronically stored information, as described in Attachment B-1, will be located on the SUBJECT DEVICE and is evidence, fruits, and instrumentalities of bribery in violation of

1

18 U.S.C. §§ 666(a)(2).  The SUBJECT DEVICE will be searched according to the protocol set forth in Attachment C.

3.      This affidavit is also made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC ("Google") to disclose to the government information associated with an email account, jamespaik7@gmail.com, (the "SUBJECT ACCOUNT") which is described more fully in Attachment A-6.  The data from the email account is stored at premises controlled by Google, an email provider located at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  JAMES conducts business from SUBJECT ACCOUNT, and the FBI has obtained and reviewed emails between JAMES, utilizing the SUBJECT ACCOUNT, and others discussing the payment of bribes in exchange for leases on property owned by the Port of San Francisco along with emails where JAMES is conducting regular business.  JAMES also uses SUBJECT ACCOUNT to conduct normal business with the Port of San Francisco such as emailing the Port a copy of a certificate of insurance for his business.  There is probable cause to believe that the electronically stored information, as described in Attachment B-2, will be located on the SUBJECT ACCOUNT and is evidence, fruits, and instrumentalities of conspiracy and bribery in violation of 18 U.S.C. §§ 371 and 666(a)(2).  A preservation request was sent to Google for SUBJECT ACCOUNT on or about October 3, 2023.  Google confirmed the receipt of the Law Enforcement request and gave it reference number 44007070.

4.      This Court has jurisdiction to issue the requested warrant for the SUBJECT ACCOUNT because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i)

and "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii).

5.      In short, and as described in more detail below, the FBI has been investigating the PAIKS, and this investigation has developed evidence that the PAIKS have engaged in a bribery scheme to evade the legitimate lease bidding process at the Port of San Francisco (the Port) by giving cash payments to a Port employee who has been cooperating with law enforcement (CHS-1) in order to illicitly and improperly obtain leases for two restaurant spaces at the Port.

6.      As part of this scheme, the PAIKS made payments to CHS-1, seeking to gain advantages unavailable to the general public, including special treatment by city employees in the form of access to specific Port sites, favorable and more lenient treatment during the lease bid process, and the avoidance of review by certain departments and entities that JAMES believed would reject his bid for restaurant space.

7.      JAMES also told the CHS that he had a "good relationship" with a Port of San Francisco employee who formerly oversaw the awarding of restaurant and other leases at the Port.  Based on my training and experience, I believe that when JAMES said he had a "good relationship" he meant that he paid this other Port employee bribes.  In offering to bribe CHS-1, JAMES told the CHS that he had also "worked closely" with city employees in Redwood City, which CHS-1 understood to mean that JAMES had bribed those city employees.  JAMES has operated restaurants and leased restaurant space since at least 2018, according to financial records I have reviewed.[1]

8.      JAMES used the SUBJECT DEVICE to communicate with CHS-1.  Those

---

[1] This application seeks authority to search the SUBJECT DEVICE and SUBJECT ACCOUNT for evidence of the Subject Offenses dating back to 2018.

communications include discussions about restaurant projects JAMES has an interest in, tours of these spaces, which were not accessible to other potential interested parties, and payments to CHS-1 in exchange for favorable official acts. As such, and as set forth in greater detail below, I submit that there is probable cause to charge JAMES and HYE with violating the Subject Offenses and to search the SUBJECT DEVICE for evidence, instrumentalities, contraband, and/or fruits of the Subject Offenses.

9.      JAMES used SUBJECT ACCOUNT to communicate with CHS-1 and others. Those communications include discussions about payments for favorable official acts. As such, and as set forth in greater detail below, I submit that there is probable cause to search the SUBJECT ACCOUNT for evidence, instrumentalities, contraband, and/or fruits of the Subject Offenses.

10.      This affidavit is submitted for the limited purpose of securing a criminal complaint and search warrants. Therefore, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that JAMES and HYE have violated the Subject Offenses, and that evidence, fruits, and instrumentalities of those violations are located on the SUBJECT DEVICE and the SUBJECT ACCOUNT. I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, information provided by a confidential human source, and information provided by records and databases. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

## AFFIANT BACKGROUND

11.     I am a Special Agent with the Federal Bureau of Investigation and have been so since January 2016.  I received approximately 20 weeks of training at the FBI Academy in Quantico, Virginia.  During that time, I received training in various areas, including evidence collection, interviewing, legal procedure and process, source management, investigative technology, firearms and tactical training, and defensive tactics.  I am currently assigned to the Public Corruption squad of the FBI's San Francisco Field Division.  I am responsible for investigating, among other things, violations concerning honest services fraud, bank and wire fraud, bribery, obstruction of justice, and extortion. Prior to my work in Public Corruption, I was assigned to the Violent Crimes Against Children squad.  I also have a master's degree in forensic psychology.

## APPLICABLE STATUTES

12.     Title 18, United States Code, Section 666(a)(2), prohibits bribery of local officials who are agents of organizations receiving federal funds. The elements of the offense include the following:

    i.    A person was an agent of an organization, a state, local or tribal government, or an agency of a state, local, or tribal government;

    ii.    The organization, state or local government received federal assistance in excess of $10,000 in a one-year period;

    iii.    The one-year period of federal assistance was within twelve months before or after the commission of the offense;

    iv.    The defendant gave, offered, or agreed to give a thing of value to any person;

    v.    The defendant intended to influence or reward the agent of the organization or agency in connection with a transaction or series of transactions of the

organization or agency that involved $5,000 or more; and,

vi.    The defendant acted corruptly.

13.    **Title 18, United States Code, Section 371** prohibits Conspiracy to Commit bribery of local officials. The elements of the offense include the following:

i.    There was an agreement between two or more persons to commit bribery;

ii.    The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and,

iii.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

## EVIDENCE OF CRIMES LIKELY TO BE FOUND ON THE SUBJECT DEVICE

14.    Based on my training, experience, and research, I know that when an individual uses an electronic device as a means of communication in furtherance of a criminal offense, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium that will contain evidence of the crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

15.    Per records obtained from Verizon Wireless, the SUBJECT DEVICE currently associated with phone number (408) 515-5258 is a Samsung Galaxy S22, International Mobile Equipment Identifier ("IMEI") 351561160527640, and an International Mobile Subscriber Identity ("IMSI") of 311480819775569.  The IMEI is a unique number associated with the device itself.  The IMSI is a globally unique code number that identifies a device subscriber to the network.  The IMSI is linked to the account information with the carrier, in this instance, Verizon.  The IMSI resides in

the SIM card which can be moved from one device to another. Cellular devices like the Samsung Galaxy S22 use a SIM card to store the subscriber's information like phone number and other personal data that proves a user is in fact a subscriber to that carrier. This means that a subscriber can put the SIM card into any cellular device to instantly continue using it on the network with all previous subscription information, like a phone number, to make phone calls, send text messages, and send emails.

16.     Based on my training and experience, I know that individuals attempt to preserve as much information from their old devices as they upgrade to new ones, to include photographs, text messages, contact information, and call logs. Information that was previously stored on an older device is typically transferred to the user's new device through the SIM card and other storage mediums, such as SD memory cards inserted into the device. While SIM and SD cards can transfer over information stored on the phone itself, applications (apps) and accounts often accessed on cellular telephones can store information within the account itself, for example, email accounts store data in the user's account, not within the phone's memory. By logging into these apps and accounts on the new device, the account's information will become accessible to the user. Based on my training and experience, I know information stored within these apps and accounts can be downloaded to the cellular telephone's memory storage as needed, like attachments to emails or photographs sent within apps. Therefore, even while the device itself may be changed, much of the same information will be stored on the new device.

17.     Based on the subscriber information from Verizon, this particular phone, the SUBJECT DEVICE, has been utilized by JAMES since March 19, 2023. The user address is listed as 2886 Geary Blvd, Apartment 3, San Francisco, California, which is the residential address for the PAIKS.

18.     As discussed in the section below regarding probable cause, the investigation

demonstrates that JAMES uses the SUBJECT DEVICE to conduct business matters relating to

his restaurant business at Nick's Lighthouse.  This includes placing phone calls and sending text

messages to the CHS-1 to discuss current and anticipated lease information on Port of San

Francisco property.  Based on my training and experience, I know that individuals who use

cellular telephones also keep them on their person or in close proximity.  I also know that

cellular telephone users often store their devices inside their residence, in their vehicles, or at

place of employment when they are present at such residence or place of employment.  Based on

the foregoing, there is probable cause to believe that the SUBJECT DEVICE will be on the

person of JAMES, at his residence, in a vehicle controlled by him, or at his place of employment.

Therefore, this application seeks authorization to search the person of JAMES (Attachment A-2),

his residence (Attachment A-3), his restaurant (Attachment A-4), and his vehicles[2] (Attachment

A-5) for the sole purpose of seizing and searching the SUBJECT DEVICE. For example, if

agents locate and seize the SUBJECT DEVICE on JAMES' person, agents will not be permitted

to search JAMES' residence, business, or vehicles.

**EVIDENCE OF CRIMES LIKELY TO BE FOUND ON THE SUBJECT ACCOUNT**

19.     Based on my training, investigative experience, and discussions with other law

enforcement officers, I know that:

> i.     Individuals like JAMES, who are involved in crimes, like the Subject Offenses,
>
> often maintain records of their illegal activities to assist them in keeping track of
>
> cash, funds, or other benefits received, owed or invested in their own names or in

---

[2] The PAIKS own the following vehicles: a Gold 2012 Toyota Sienna, license plate number
6SYN054, registered to Min Ki Paik at 2886 Geary Blvd Apt 3, SF, CA.  A Navy 2015 Toyota
RAV4, license plate no. 7MYJ911, registered to Hye Ja Paik 2886 Geary Blvd Apt 3, SF, CA.

the names of nominees or aliases. These records are often maintained for years, in hard copy and digital form, and often include emails utilized in furtherance of the Subject Offenses, as well as photographs of items relevant to their schemes;

ii.     Individuals like JAMES, who are involved in crimes, like the Subject Offenses, often make purchases and conduct financial transactions related to the Subject Offenses that generate records which often include email correspondence;

iii.    Individuals like JAMES who are involved in crimes, like the Subject Offenses, often maintain email correspondence documenting contact information, telephone directories, address books, and other electronic files, such as photographs, which identify associates involved in their illegal activities and prior communications with those individuals.

### <u>INFORMATION ABOUT GOOGLE</u>[3]

20.    Google is a U.S. company that offers to the public, through its Google Accounts, a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these services offer additional functionality if the user signs into their Google Account.

21.    Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

---

[3] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

22.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

23.     As described above, Google, Inc. provides electronic mail ("e-mail") access, to the public. Google, Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account listed in Attachment A-5. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google, Inc. subscribers) and information concerning subscribers and their use Google, Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

24.     A Google, Inc. subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Google, Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

25.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

26.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

27.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

28.     In my training and experience, any email that is sent to or from a Google subscriber is stored in the subscriber's mailbox on Google's servers until the subscriber deletes the email or the subscriber's mailbox exceeds the storage limits pre-set by the Internet service provider. If the message is not deleted by the subscriber, the account is below the storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

29.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either

inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

30.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

31.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

32.     Other information connected to the use of a Google account may lead to the discovery of additional evidence.  For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and

instrumentalities of the crimes under investigation.

33.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## FACTS SUPPORTING PROBABLE CAUSE

34.     The Port of San Francisco is a semi-independent organization that oversees the port facilities at San Francisco. The Port is responsible for managing the larger waterfront area that extends from the anchorage of the Golden Gate Bridge to the city line just beyond Candlestick Point. The Port oversees the leasing of retail real estate contained in their area of responsibility, including Nick's Lighthouse, Pompei's Grotto (now out of business), and Lou's Fish Shack (now out of business), Butterfly restaurant (now out of business) and Tarantino's restaurant (now out of business).  Pompei's Grotto and Lou's Fish shack are located next door to each other in the Fisherman's Wharf area of the city of San Francisco.

35.     For retail opportunities, including restaurant spaces, the Port issues Request for Proposals (RFP) for sites it is seeking to lease. The RFP is circulated through community organizations, trade associations, and posted under Contract Opportunities on the Port's website. The RFP provides the minimum terms required and outline financial, experience and expertise standards. Respondents are required to submit forecasted financial projections, capital to be invested, proposed business terms that exceed the minimum and financial statements of the entities. As part of the Port's approval process, all prospective tenants are required to complete a lease application. This application is reviewed by third-party real estate brokers, contracted by the

Port. The real estate brokers are also responsible for showing the property to perspective

applicants. After the applications are reviewed by the real estate brokers, they are sent for

approval to a panel of Port employees who determine which application for the RFP will be

awarded the contract. When an application is approved, a Port Property Manager will draft and

submit Basic Lease Information to the City Attorney's Office for assignment and preparation of

the lease.

36.     According to the Port of San Francisco's policy, Port Commission approval is required

for properties where:

> i.     The rent is below parameter rates or Fair Market Value;
>
> ii.    Total lease value over term is under $1 million;
>
> iii.   Lease duration is 6 or more years.

37.     The FBI in this case utilized a Confidential Human Source ("CHS-1"), who is a Port of

San Francisco employee. CHS-1 oversees the operation of the retail spaces owned by the Port

and often leased out for restaurants or other facilities. In May 2023, CHS-1 was approached by

JAMES, who told CHS-1 that he was interested in obtaining leases at the Port for his restaurants.

JAMES told CHS-1 that he owned over 30 businesses in the Bay Area, including several

restaurants.

38.     CHS-1 and JAMES met in person on numerous occasions in 2023 and they also

communicated by text and phone and email.  On numerous occasions at these meetings and calls,

JAMES told CHS-1 that JAMES would give CHS-1 cash in exchange for assistance with

obtaining leases at several retail spaces on Port Property. CHS-1 told JAMES that what JAMES

was proposing was illegal or inappropriate, but JAMES persisted. JAMES frequently texted,

called, or approached CHS-1 in person to ask CHS-1 about leases, offering to pay CHS-1

thousands of dollars if CHS-1 could get JAMES a new lease on several vacant properties.

JAMES told CHS-1 that he would pay extra money to anyone that CHS-1 needed to bring in to

assist with the process. CHS-1 reported to agents that JAMES had also attempted to bribe a

realtor contracted by the Port, REALTOR-1, for assistance with obtaining a lease at Port

property formerly occupied by the Butterfly restaurant. CHS-1 reported these overtures to his

superiors, who brought this information to the attention of the FBI. The FBI opened an

investigation, and CHS-1 met with JAMES on multiple occasions at the direction of the FBI.

CHS-1 provided agents with emails to/from JAMES' email account, the SUBJECT ACCOUNT.

CHS-1 utilized both audio and video recording devices to capture meetings with JAMES and

HYE. The FBI also utilized an Undercover Employee (UCE-1), who posed as CHS-1's co-

worker during several interactions with JAMES and also utilized both audio and video recording

devices to meet with JAMES and his wife, HYE PAIK.

39.     As part of this investigation, the FBI has learned that JAMES is a businessman operating

in the San Francisco Bay Area. JAMES and his wife, HYE have owned several restaurants and

are currently the operators of Nick's Lighthouse, a restaurant and bar located at 2815 Taylor

Street in San Francisco. Nick's Lighthouse is located on property owned by the Port. According

to JAMES, he and his wife have owned 30 businesses in the Bay Area, several of which were

restaurants. JAMES told the CHS-1 that he and his wife did not always put businesses in their

own names in order to conceal their ownership of these enterprises. JAMES told CHS-1 that

sometimes businesses were in JAMES's nephews', nieces', or daughter's name.

40.     On or about May 13, 2023, JAMES sent an email from SUBJECT ACCOUNT to

REALTOR-1 containing a screenshot of a text message "If you butterfly restaurant pier 33

successful lease for me i will give to $5000 cash for you. Do not say anybody."  On or about

May 15, 2023, REALTOR-1 emailed SUBJECT ACCOUNT, "James, That is illegal and I will not take part in that. Please understand that the Port will determine who will take on the butterfly space. I will get you a proposal this week. Thank you,".  As stated above, the Butterfly was a restaurant formerly located on Port of San Francisco property at 33 The Embarcadero, San Francisco, CA 94133.  The property is now vacant.  REALTOR-1 forwarded the email to another Port employee, who forwarded it to CHS-1.  CHS-1 provided it to the FBI.

41.     On or about August 12, 2023, JAMES sent an email from SUBJECT ACCOUNT to CHS-1 containing a screen shot of a text message, "CAN WE LEASE THAT PLACE. LAST 30 YEARS NO ONE OPEN."  The screen shot contained a photograph of a restaurant space formerly occupied by a restaurant called Tarantino's located at 206 Jefferson St, San Francisco, CA 94133.

42.     On or about August 31, 2023, JAMES sent a text message to the CHS-1 and asked, "can I see inside pampanis".  Based on previous conversations between CHS-1 and JAMES, CHS-1 understood that JAMES was referring to Pompei's Grotto, a vacant restaurant space owned by the Port located at 340 Jefferson Street, San Francisco. CHS-1 responded to JAMES's request:

43.     "Hello James. Thank you for your interest in the soon to be listed property. However, tours of the building are not available right now."

44.     CHS-1 told JAMES that what JAMES was requesting from CHS-1 was prohibited by rules set forth by the Port, which prohibit giving one bidder a tour of a property coming up for lease so as not to give that bidder an unfair advantage when it came time to submit bids. Here, giving JAMES a tour would have given him an unfair edge because JAMES would have knowledge of the layout and size of the space as well as what renovations and equipment to restaurant would need to become operational.

45.     On or about September 13, 2023, CHS-1 had a conversation with JAMES at Nick's

Lighthouse.  At the direction of the FBI, CHS-1 audio recorded the meeting. During this

conversation. CHS-1 told JAMES that JAMES had been filing income information for Nick's

Lighthouse with the Port incorrectly and showed JAMES how to correctly report this

information. The lease for Nick's Lighthouse dictates that a base-rent plus 6.5% of the income of

the restaurant need to be paid to the Port monthly. However, JAMES had paid an incorrect

percentage on several occasions, which CHS-1 pointed out to JAMES. During this conversation,

JAMES complained that he could never get in touch with the Port Property Manager that was

overseeing the leasing of the Butterfly restaurant. JAMES told CHS-1 that he has been waiting

for over 6 months to hear the results of his bid on the Butterfly space.  JAMES stated that he

wanted to pay CHS-1 for CHS-1 to help JAMES obtain the leases at vacant properties formerly

occupied by Lou's Fish Shack and Pompei's Grotto and expedite the lease for the restaurant

space known as Butterfly.

46.     Several hours after this meeting, JAMES called CHS-1 utilizing the SUBJECT DEVICE,

shown in call logs as an incoming call to CHS-1's phone. The call lasted approximately 2

minutes. During this call, CHS-1 reported that JAMES expressed his gratitude for CHS-1's

assistance and asked to meet CHS-1 outside of the CHS-1's office at Pier 1 in San Francisco.

During this meeting, JAMES gave CHS-1 an envelope, which contained $3,000 in $100 bills,

and again thanked CHS-1 for CHS-1's help.  CHS-1 turned over the $3,000 to the FBI.

47.     On September 25, 2023, JAMES texted the CHS-1, "good morning. Can I see the lease

luis restaurant" The CHS-1 responded, "Hello, you would like to lease Lous restaurant?" JAMES

responded "yes". These communications took place over the SUBJECT DEVICE. JAMES stated

that he also wanted to see the previous leases on the properties, which would give him an unfair

advantage over other potential bidders. For example, the previous leases contained information

like how much the prior tenant paid in rent, which could be used to calculate the current fair-

market value of the property, a factor bidders must take into account in their bid proposals. CHS-

1 has informed law enforcement that CHS-1 could only show JAMES the restaurant and lease

documentations because of his official position as a Port employee, and that it would violate Port

rules and regulations for CHS-1 to show JAMES the restaurant and the lease documentation for

these properties.

48.     On October 2, 2023, at the direction of the FBI, the CHS-1 texted JAMES and stated that

CHS-1 would be able to take JAMES on a tour of the two restaurant spaces in which JAMES

was interested. JAMES responded "ok very good. Wednesday 11 go together. Thanks"

49.     The tour took place on October 4, 2023, with JAMES and his wife HYE PAIK. FBI

agents conducted surveillance, and CHS-1 audio and video recorded the meeting.  Throughout

the meeting JAMES indicated that he understood that the CHS-1 was not supposed to be giving

him a tour, per Port policy. The CHS-1 thanked JAMES for the $3,000 JAMES gave to CHS-1

on September 13, 2023.  JAMES acknowledged the payment and explained that he wanted to

continue to have a "good relationship" with CHS-1. Based on my training and experience

investigating bribery cases, I believe that when JAMES' expressed his desire to continue to have

a "good relationship" with CHS-1, JAMES intended to convey that he wanted to continue to pay

CHS-1 in exchange for favorable official treatment with regard to Port Authority leases.

50.     At the direction of the FBI, CHS-1 told JAMES that CHS-1 was risking his/her job to

help JAMES and that if JAMES wanted to obtain a lease on either of these restaurants, CHS-1

would have to circumvent the normal bid process to ensure JAMES' success. JAMES indicated

that he wanted to pay CHS-1 in order to bypass the standard bid process. CHS-1 explained that

in the CHS-1's official capacity, he could assign the lease to JAMES but that he would need assistance from another Port employee to move the process along. JAMES agreed that the CHS-1 should involve another person, in furtherance of subverting the bid process, and stated that he would also help take care of that person. Based on my training and experience, when JAMES said that he wanted to "take care" of someone, he meant that he intended to bribe that person.

51.     After the tour of the restaurants, JAMES, HYE and CHS-1 walked to the area behind Nick's Lighthouse. HYE entered Nick's Lighthouse. JAMES asked the CHS-1 to wait outside, and JAMES went inside Nick's Lighthouse for a several minutes. When JAMES returned, he handed CHS-1 an envelope and told him "Don't change the mind. I want to keep going, lifetime. Believe me, okay?... Very good for you. Very good for you." The envelope contained $3,000 in $100 bills and "Thank you!" was written on the outside of the envelope. JAMES told CHS-1 that this $3,000 was for the Port employee who would be assisting JAMES and CHS-1 in circumventing the bid process for the leases at vacant properties formerly occupied by Lou's Fish Shack and Pompei's Grotto.

52.     During conversations between JAMES and CHS-1 on September 13, 2023, and October 4, 2023, JAMES told CHS-1 that he wanted to change the names on the Nick's Lighthouse lease. Previously, Nick's Lighthouse was leased in the names of two of JAMES' nephews, Nephew-1 and Nephew-2. CHS-1 believed that JAMES and his wife could not pass the rigorous background checks conducted by the Port that were required for JAMES and HYE PAIK to secure the Nick's Lighthouse lease under their own names when they took over management of the restaurant, so they put the lease in their nephews' names, even though, based on conversations between CHS-1 and JAMES, JAMES' nephews do not participate in the running of the restaurant. During several meetings between CHS-1 and JAMES, JAMES asked CHS-1 to

put Nick's Lighthouse into JAMES and HYE PAIK's name, circumventing the standard

background check process, which includes a credit check, a check to ensure that the lessees are

in good standing financially, and do not have other failed businesses. JAMES indicated that he

would pay a bribe to CHS-1 for his/her assistance with this process.

53.     On October 9, 2023, CHS-1 and JAMES exchanged the following text messages:

      CHS-1: Can you meet on Wednesday at 2pm. I have a couple of lease paperworks ready.

      We will need to get items signed in order to meet certain deadlines and avoid

      interruptions. Please note that will need your help for pushing things forward

      JAMES: I will give something Wednesday 2pm. Do you need my daughter? Where can I

      meet you. Thanks.

      CHS-1: For Nick you want wharf 777. For the others you said you and your wife. Do you

      need me in close her on one. I suggest we add her later to get things done quickly.

      JAMES: Okay. Any kind Okay. Any way we going to life time together port for help.

      Thanks.

54.     Based on my training and experience, I believe that when JAMES says, "I will give

something Wednesday" and "Any way we going to life time together port for help" he means

that he will pay/bribe CHS-1 cash in exchange for CHS-1's assistance.

55.     In text messages, sent via SUBJECT DEVICE between October 5 and October 10, 2023,

JAMES stated that for the amended lease at Nick's Lighthouse and the subsequent leases at

Lou's Fish Shack and Pompei's Grotto, JAMES should be listed as the CEO and HYE PAIK

should be listed as the Secretary. JAMES also told CHS-1 that he wanted his daughter, GRACE

JAMES listed on the amended lease for Nick's Lighthouse. CHS-1 has told law enforcement that

it would be improper and against Port rules to do this.

56.     On October 11, 2023, CHS-1, JAMES, HYE PAIK, and UCE-1 (posing as CHS-1's co-worker), met with JAMES at a building formerly occupied by Pompei's Grotto. CHS-1 introduced his/her "co-worker" as someone that could help JAMES and CHS-1 circumvent the standard bid process for the leases at Lou's Fish Shack and Pompei's Grotto. Both CHS-1 and UCE-1 audio and video recorded the meeting.  FBI agents also conducted surveillance of the meeting.  JAMES, HYE PAIK, CHS-1, and UCE-1 discussed the amended lease for Nick's Lighthouse and JAMES was shown a draft of the new lease. CHS-1 and UCE-1 explained to JAMES that they would send the documents to JAMES via DocuSign. UCE-1 and CHS-1 indicated that this change would be reflected at the beginning of November and that this amendment would not be given the same level of scrutiny usually required for amended leases. JAMES asked if CHS-1's supervisor would see this. CHS-1 and UCE-1 told JAMES that they were going to go around CHS-1's supervisor, and JAMES stated that he understood.

57.     UCE-1 and CHS-1 showed JAMES and HYE PAIK details from the previous leases for Lou's Fish Shack and Pompei's Grotto. JAMES reviewed these documents and UCE-1 explained to JAMES what the previous tenants paid in rent for these properties. CHS-1 explained that the rent was higher on these properties because the previous tenants only paid a base rent, which differs from Nick's Lighthouse rent, where JAMES pays a lower base rent but also 6.5% of the restaurant's income monthly. CHS-1 and UCE-1 told JAMES and HYE PAIK that they could help them get the leases on these properties, but that JAMES would have to submit a bid in response to the RFP that would be made public in the next few weeks. UCE-1 and CHS-1 explained that JAMES needed to submit a bid for a reasonable rental amount, around $15,000 a month so that JAMES's bid would not be dismissed immediately for being too low. CHS-1 and UCE-1 explained that JAMES would still receive a benefit by circumventing the background

check, financial vetting, and insurance vetting process. JAMES nodded, laughed, and said "okay" throughout this conversation. HYE PAIK was also present during this conversation. JAMES also asked if he could find out what other people were bidding. UCE-1 told him not to worry about what other people bid as long as JAMES bid higher than the previous lease amount. JAMES thanked UCE-1 and CHS-1 and stated that he understood. He then asked to talk to CHS-1 about "paperwork." At that point, JAMES handed CHS-1 an envelope that contained $3,000 in $100 bills. CHS-1 provided the $3,000 to FBI agents.

58.     On or around October 12, 2023, JAMES sent a picture via text message, utilizing the SUBJECT DEVICE, to CHS-1 that included names and email addresses for his nephews. JAMES asked CHS-1 to send a DocuSign document to these email addresses for the transfer of names on the lease for Nick's Lighthouse. CHS-1 then sent a Consent to Assignment of Lease for Nick's Lighthouse via DocuSign to JAMES and his nephews, who digitally signed the document. JAMES believed that signing this document transferred the name on the lease for Nick's Lighthouse from JAMES's nephews to JAMES and HYE PAIK. On October 16, 2023, JAMES sent an image of this consent form with signatures to the CHS-1 by utilizing SUBJECT DEVICE.

59.     On October 17, 2023, under the direction of the FBI, CHS-1 scheduled a meeting with JAMES at Lou's Fish Shack on Fisherman's Wharf for the next day. JAMES requested that CHS-1 bring UCE-1 with him/her to the meeting.

60.     On October 18, 2023, JAMES, HYE PAIK, CHS-1, and UCE-1 met in person at Lou's Fish Shack. Both CHS-1 and UCE-1 surreptitiously audio and video recorded the meeting, and FBI agents also conducted surveillance of the meeting.  JAMES, HYE PAIK, CHS-1, and UCE-1 sat around a dining table inside Lou's to discuss the leases.  JAMES said that he wanted both

leases.[4] JAMES explained that he wanted both spaces because if someone else leased one, there was a potential for arguments or disagreements between JAMES and the other tenant. JAMES believed it would be better to lease both properties and have the whole block. JAMES told them that he already bought patio furniture for Lou's, a total of 20 tables and 40 chairs.

61.     UCE-1 told JAMES that UCE-1 works in the Real Estate Development department for the Port and that CHS-1 works in the Leasing Department. UCE-1 told JAMES that UCE-1 would draft the Pompei's and Lou's restaurant leases with all the terms and conditions that JAMES wanted, and then UCE-1 would enter the lease into the Port's system. UCE-1 told JAMES that normally leases are for 5 years. JAMES stated that he wanted the longest possible lease for Pompei's and Lou's and requested a 10-year lease with the option to extend two times, for 10 more years each.  JAMES asked multiple times throughout this meeting when CHS-1 and UCE-1 would start the paperwork for the leases for these spaces. CHS-1 and UCE-1 explained to JAMES that JAMES would still need to submit a bid in response to the RFP put out by the Port, so that it wouldn't look suspicious when he was awarded the leases. The RFP was not yet posted at the time of this meeting. JAMES stated that last time, UCE-1 and CHS-1 told him that he would have to pay $14,600 and $15,433 a month in rent for Lou's and Pompei, respectively. UCE-1 confirmed that these were the rental prices for the previous leases, but that fair market value studies indicate the value is now closer to $17,000. UCE-1 explained to JAMES that if he bids closer to $15,000, he will save approximately $240,000 over the course of a 10-year lease. UCE-1 told JAMES that he cannot bid less than the previous lease amounts otherwise it would look suspicious. JAMES replied, "I know, I know" and then stated that he has opened 30

---

[4] At an earlier October 11 meeting, JAMES stated that he might only want to lease one of the two restaurants, Pompei's Grotto or Lou's Fish Shack, due to the high cost of the leases.

different businesses, so he understands.

62.     JAMES asked when the paperwork for Lou's and Pompei's would be started. He explained that he went through a lengthy process for the restaurant space at Butterfly and he did not receive timely responses from the Port Property Manager for that location. JAMES expressed frustration at the process and stated he had applied almost a year ago. CHS-1 stated that UCE-1 and CHS-1 were "fast-tracking" JAMES' paperwork for Pompei's and Lou's and typically, a credit check alone can take one to two months. JAMES laughed and said, "I like it." UCE-1 asked JAMES if they could all speak openly about "helping each other", explaining that CHS-1 and UCE-1 were risking their jobs. JAMES responded, "I know, I know." JAMES agreed with UCE that he was going to be saving a lot of time and money by going through UCE-1 and CHS-1.  JAMES stated that he was "not a free man, we just make money, I want to give to something else. That's why I am a very honest man, I want to help you and [CHS-1], keep going a lifetime."  UCE-1 asked "for both [leases] can you give us an idea for what you are willing to help us with?" JAMES responded: "When you finish the lease, let me see, maybe, maybe 10, 10 first. And then I want to each yearly for Christmas Day and Thanksgiving Day… New Years Day, what I make something else, I give to you yearly... Not every month. Yearly for the Thanksgiving, Christmas day, for the holiday, make good money. I'm give something else for your lifetime." HYE PAIK was present throughout this conversation.

63.     Based on my training and experience, and from conversations with CHS-1 and others, I believe that JAMES is telling UCE-1 and CHS-1 that he wants to give them cash payments in exchange for them assisting him obtain valuable leases of Port property. When JAMES said "10, 10" he means he wants to pay $10,000 each to UCE-1 and CHS-1, upon completion of obtaining the leases for Pompei's and Lou's. UCE-1 and CHS-1 discussed the amount and frequency of

payments with JAMES and UCE-1 told JAMES that UCE-1 didn't want to feel pressured. JAMES responded that he understood. UCE-1, CHS-1 and JAMES agreed that JAMES will pay them each $5,000 up front and $5,000 once the paperwork is done.

64.     JAMES then stated that he would pay the initial $5,000 up front payment the following day.  HYE PAIK interjected and explained that she had cash with her now.  JAMES said that his wife, HYE PAIK handles the money and follows JAMES.  HYE PAIK then walked a short distance away from the table and came back with two envelopes, which she handed to CHS-1 and UCE-1. Each an envelope contained $5,000 in $100 bills. After the meeting, the cash was turned over to the FBI.

65.     CHS-1 and UCE-1 told JAMES that UCE-1 would email JAMES a draft of the leases for the two properties in the next week. They explained to JAMES that the email would go to SUBJECT ACCOUNT from UCE-1's personal email address because they could not use official Port email addresses. JAMES confirmed his email address and stated that he understood why the emails could not be sent to or from official Port account. At the direction of the FBI, CHS-1 prepared fictitious lease agreements for both properties and UCE-1 emailed the leases to SUBJECT ACCOUNT on or about November 1, 2023.

66.     On or about November 2, 2023, JAMES called CHS-1 and stated he wanted to sign the leases but had a few edits.  JAMES also texted CHS-1 from the SUBJECT DEVICE: "Starting 6/1 We will give 10 +5=15. Thanks" and "Good morning. Start may 1 or June 1st. Can you meet tomorrow morning? Thanks".  Based on my training and experience and discussion with CHS-1, JAMES was stating that he wanted the lease period to begin on either May or June of 2024 and was going to pay CHS-1 an additional bribe of $5,000 on top of what was previously agreed upon.

67.    Finally, The Port of San Francisco received more than $10,000 in federal financial assistance in 2023.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

68.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  Because of the make and model of SUBJECT DEVICE, I believe it accesses the Internet.  This information can sometimes be recovered with forensics tools.

69.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

70.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

71.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

72.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

73.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

74.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

75.     I know that when an individual uses an electronic device in furtherance of the crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

76.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**CONCLUSION**

77.     On the basis of my participation in this investigation and the information summarized

above, I submit that there is probable cause to conclude that on or about and between May 2023

and November 2023, JAMES and HYE PAIK have violated 18 U.S.C. § 371, conspiracy to

commit bribery, and 18 U.S.C. § 666(a)(2), bribery of an agent of an organization receiving

federal funds.  I therefore request that the Court authorize the attached criminal complaint.

78.     I further submit, based on the foregoing, that there is probable cause to believe

that the SUBJECT DEVICE and SUBJECT ACCOUNT contain evidence, fruits, and

instrumentalities of violations of the Subject Offenses. The items listed in Attachment B-1 and

B-2 are evidence of these crimes, contraband, or fruits of these crimes, or property that is or has

been used as instrumentalities to commit the foregoing offenses.  Therefore, I respectfully

request that a warrant be issued that authorizes the search of the SUBJECT DEVICE, which is

described in Attachment A-1.  As set forth above, the SUBJECT DEVICE may be found on

JAMES' person (Attachment A-2), in his residence (Attachment A-3) or business (Attachment

A-4), or inside vehicles under his control (Attachment A-5).  I request authorization to search the

locations described in Attachments A-2 through A-5 for the SUBJECT DEVICE.  Executing

agents will not be permitted to search the locations described in Attachments A-2 through A-5

once the SUBJECT DEVICE is located.  For example, if agents locate and seize the SUBJECT

DEVICE on JAMES' person, agents will not be permitted to search JAMES' residence, business,

or vehicles. I further request authorization to search the SUBJECT DEVICE and the SUBJECT

ACCOUNT, described in Attachment A-6, and to seize the electronically stored items listed in

Attachments B-1 and B-2.  The SUBJECT DEVICE will be searched pursuant to the protocol

and procedures described in Attachment C.


**/s/ Allison Lopez**
 ALLISON LOPEZ
Special Agent
FEDERAL BUREAU OF INVESTIGATION



Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and
4(d) on November 14, 2023. This application and warrant are to be filed under seal.



_____
HONORABLE SALLIE KIM
United States Magistrate Judge

## **ATTACHMENT A-1**

The SUBJECT DEVICE to be searched is a Samsung Galaxy S22 cellular telephone associated with phone number (408) 515-5258, subscribed to HYE PAIK, with known user MIN "JAMES" PAIK with International Mobile Equipment Identifier ("IMEI") 351561160527640, and an International Mobile Subscriber Identity ("IMSI") of 311480819775569.

Agents executing the warrant may search the locations described in Attachments A-2 through A-5 for the SUBJECT DEVICE.  Executing agents are not permitted to further search the locations described in Attachments A-2 through A-5 once the SUBJECT DEVICE is located.

## ATTACHMENT A-2

The person, Min Ki PAIK, also known as "James", date of birth March 11, 1960, 5'5" tall, weight of approximately 150 pounds, with brown hair and black eyes to be searched for the cell phone described in Attachment A-1.



**ATTACHMENT A-3**

The residence of MIN "JAMES" PAIK located at 2886 Geary Blvd, Apartment 3, San Francisco,

CA, to be searched for the cell phone described in Attachment A-1.



**ATTACHMENT A-4**

NICK'S LIGHTHOUSE, a restaurant operated by MIN "JAMES" PAIK, located at 2815 Taylor

St, San Francisco, CA to be searched for the cell phone described in Attachment A-1.



**ATTACHMENT A-5**

One Gold 2012 Toyota Sienna, license plate number 6SYN054, registered to Min Ki Paik at 2886 Geary Blvd Apt 3, SF, CA.

One Navy 2015 Toyota RAV4, license plate number 7MYJ911, registered to Hye Ja Paik at 2886 Geary Blvd Apt 3, SF, CA.

## **ATTACHMENT A-6**

The **SUBJECT ACCOUNT** is a Google-based cloud storage and email account associated with

email address, jamespaik7@gmail.com, and stored at premises controlled by Google LLC,

headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043

**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

1.      All records, communications, text messages, photographs, or other information contained in the SUBJECT DEVICE described in Attachment A-1 that relate to the conduct described above, including violations of 18 U.S.C. §§ 371 (Conspiracy) and 666(a)(2) (Bribery of an agent of an organization receiving federal funds): specifically, for January 2018 to present:

2.      any records, communications, or materials, including electronic mail and electronic messages, regarding preparatory steps taken in furtherance of bribery;

3.      any communications between JAMES and Port of San Francisco employees or contractors;

4.      any records, communications, or materials, including electronic mail and electronic messages, that relate to business dealings at the Port of San Francisco or any city or county agencies;

5.      any lists or contact information tending to identify customers, clients, or other conspirators involved in the commission of bribery, and related identifying information;

6.      any records, communications, or materials, including email and electronic messages, concerning bribes to Port or City employees and/or organizations associated with them;

7.      electronically-stored documents or records of financial transactions or instruments, such as records of travelers checks, bonds, stock certificates, wire transfers, money orders, cashier's checks, passbooks, bank checks, bank statements, credit card statements, bank deposit tickets, certificates of deposits, income tax returns, and memoranda;

8.      electronically-stored records showing unexplained wealth or evidencing the proceeds of bribery or value received in exchange for bribes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

**I.      Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A-6 is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on approximately October 3, 2023 with the Google Reference Number 44007070. Google is required to disclose to the government for each account or identifier listed in Attachment A-6 the following information from January 1, 2018 to present unless otherwise indicated:

a.      All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.      Names (including subscriber names, user names, and screen names);

2.      Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3.      Telephone numbers, including SMS recovery and alternate sign-in numbers;

4.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5.      Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

6.      Length of service (including start date and creation IP) and types of service utilized;

7.      Means and source of payment (including any credit card or bank account number); and

8.      Change history.

b.      All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c.      Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs

d.      Address book information;

e.      Content, including emails, videos, pictures, files, messages, voicemails, etc;

f.      Search and browsing history.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and/or instrumentalities of violations of conspiracy to commit bribery in violation of 18 U.S.C. § 371 and bribery of an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(2), those violations involving PAIK, and HYE PAIK, and other co-conspirators and occurring after January 1, 2018, specifically, for each Account or identifier listed on Attachment A-6, information pertaining to the following matters:

a. Financial records or financial documents;

b. Any records, communications, or materials, including electronic mail and electronic messages, regarding preparatory steps taken in furtherance of bribery;

c. Any communications between JAMES, HYE, co-conspirators, and Port of San Francisco employees or contractors;

d. Any records, communications, or materials, including electronic mail and electronic messages, that relate to business dealings at the Port of San Francisco or any State, city or county agencies;

e. Any lists or contact information tending to identify customers, clients, or other conspirators involved in the commission of bribery, and related identifying information;

f. Any records, communications, or materials, including electronic mail and electronic messages, concerning bribes to Port or City employees and/or organizations associated with them;

g. Electronically-stored documents or records of financial transactions or instruments, such as records of travelers checks, bonds, stock certificates, wire transfers, money orders, cashier's checks, passbooks, bank checks, bank statements, credit card statements, bank deposit tickets, certificates of deposits, income tax returns, and memoranda;

h. Electronically-stored records showing unexplained wealth or evidencing the proceeds of bribery or value received in exchange for bribes;

i. Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

j. Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

k. The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

**ATTACHMENT C**

**PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY**

1.      In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.      If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.      In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.      When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.      When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic

review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.      The time periods set forth in this protocol may be extended by court order for good cause.

8.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

9.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.